Thank you, may it please the court. My name is Rich Bolton and I represent the appellants of the Freedom from Religion Foundation and as members in this lawsuit. The lawsuit involves what was designated or self-described as a question that the basic question before the district court was whether or not the renewal so that this religious statue, a statue of Jesus Christ, could remain essentially on a permanent basis in the US force. The case comes to this It's just a permit, right? I mean it's a permit that's been done before and now done again, right? Yes. I mean it isn't like it's permanent, it's a permit. It has to be approved. Well what I would say in that respect, Your Honor, is that when it was approved, if it's going to stay? Or is the permit from now forever? Well according to the government and the respondents... According to the permit? I read the permit. It needs to be renewed I believe in ten years. All right. And then if it isn't, it can be, it must be removed, right? Not according to the respondents. Well the respondents argument is that if I read the permit, it says if not permitted, it must be removed. The government argues that it is essentially grandfathered by the permit that was originally granted in 1954. Who's it owned by? Pardon me? Who's it owned by? It is owned by the statue itself? Yeah. By the Knights of Columbus. And there's a plaque on the monument that indicates that the plaque was, or that the statue was put on the Forest Service land by the Knights of Columbus after basically consultation with the Forest Service in 1954. And the Knights of Columbus assume all liability and indemnify the United States. I do not know the answer to that. You don't know the answer to that? All right. And it's a statute that the government grants for recreational uses, agricultural uses, community and public uses, historical uses, research uses, and training purposes. My understanding is that the permit does not specify any particular... Well, but it's statute allowing the government to permit this land. I went to it to try to find out what it's all about. Do you know what it says? The statute allowing such permit, or allowing the Forest Service then to permit. It does, the statute allows it for recreational purposes, agricultural uses, community and public uses, historical uses, research uses, and training purposes, as I understand it. That's what the statute states. All right. I just want to make sure I have the same one down here talking about. Because you said it was permanent. I didn't see it was that way. Go ahead, make your argument. That's not going to make a difference. I'm not trying... It was never given to the United States. It was never donated to the United States. All right. Then we can go on. I don't think we need to argue about the rest, who owns it. And it was never given to anybody else. That's right. All right. That being said, the issue of whether or not, and the reason I use the word permanent is because when the permit, according to the government, was originally granted in 1954, it was designated as permanent. The government indicates that they're not sure why in 1990 it became an issue of renewal. But in any event, as we stand here before the court, now the argument by the government and the interveners, is that essentially the statute is not subject to current restrictions on such monuments or shrines, but it's basically granted. It seems to me what they're arguing is it's not subject to a new permitting procedure, but it is subject to the renewal permitting procedure. That's their argument. That's correct. But the renewal process... Let's change that, because I don't know that now that we have down what you and I agreed to, whether that's going to make much difference. Why do you have standing here? Pardon me? Why do you have standing? The issue of standing, as I said, I represent the Freedom from Religious Foundation. I know. Who's your member who has standing? Pamela Morris. And why? Because of exposure and avoidance of the monument. I could even ski in the best, this is my language, even ski in the best of power and never see it. And that's true. All of that is true. And yet, your client, your participant that's standing. Yes, your honor. Your argument, your question to me is that if in fact someone knows it's there and they object to it, then, and they do not have some. So you're suggesting that what I'm supposed to say is that there's a rule someplace that says one just knows it's there and doesn't want to go up there and therefore they have standing under which one? I think, I think your honor that the Supreme Court presidents established that the one, pardon? Which one? Well, for instance, even the town of Greece dealt with the issue of exposure. I understand the exposure, but I also understand when I looked at these cases on standing and that's why I'm putting it to you just a little bit. Valley Fort says you got to have a personal injury. And here's one who's a lady who says, I don't even know if she said she saw it. It seems to me that she might have seen it. But when you got all the record out here, she can ski Big Mountain, have the best experience of her life, even as good as Idaho, and never see it. How does she have standing? Your question to me is that if there's a government endorsement, and I understand we're not to that question yet, but if the, for instance, in Allegheny. I'm just trying to find if you have any standing because it seems to me that in order to have what you want me to buy here, I've got to suggest that you have standing and I think you've got to have at least one person who could make your organization have standing. And the district court focused on Morris. And so I read what she said, made one visit to Big Mountain more than 50 years ago, was 15 at the time, she felt the beauty. The statue is artificial and not environmentally beneficial. She wants to preserve the beauty. And now I say to myself, and now she says I avoid it. And then I say, okay, does she have to avoid it? Does it need to avoid it? Can she do anything to make it that way? Are you saying all you got to do is say I saw it one time and from now on I want to avoid it and that's enough? If in fact, and her declaration, if in fact this is a person that would otherwise frequent and go to this area of skiing and her declaration indicates that she has been a lifelong avid recreational skier in Montana and that she would go to Big Mountain, but for the presence of the. She can ski at Big Mountain and never see it. And again, you're saying that she should avoid it. No, I'm saying she can ski there and never see it. In other words, there's no reason to even avoid it. She's got to go specifically looking for it. That's not true, Your Honor. Well, that's what the evidence says. Well, the evidence indicates that on the one hand, for instance, the government's own commissioned historian, on the one hand, indicates that this religious shrine on government property is remote and many people wouldn't see it. But on the other hand, their own historian says that it is a, it is a, it is something. In fact, their argument is that it is so historical, that it's an historical part of the ski resort area and that people see it. Thousands of people come to the ski resort and see it and that it is not difficult or remote and that it is, in fact, readily visible at sea, okay? I don't want you to pause there very long because I just wanted to get those questions out about standing and supposing you have standing and get to the issues. I don't want to take you away from that argument. That's fine. Your Honor, may I also just add to the discussion that in addition to Ms. Morris, I believe that the Freedom from Militia Foundation, member William Cox also establishes standing again. Mr. Cox is a regular skier several times, many times each year and he testified in deposition that he sees the monument several times each year when he skis. I don't really think you want to stay with your standing because if you want me to question about Mr. Cox, I will. I didn't see Mr. Cox any different than anybody in Valley Forge. It seemed to me that he said he's not offended by symbols having any place for a long time and to which no one has objected. He wasn't even a member of the plaintiff's organization at the time the complaint was filed. And if I looked at the Valley Forge people, they said, well, I don't like the way it is that you're doing in Valley Forge and the Valley Forge court said that's a personal judgment that doesn't have anything to do with standing. Well, Valley Forge obviously is not the Supreme Court's last word on standing. Valley Forge, in fact, was a taxpayer standing case. It was not an exposure case at all. Since Valley Forge, obviously, the court has spoken further on the issue of taxpayer standing and the court has also spoken to the issue of unwanted exposure as has this court consistently. It's beginning with Allegheny, which was the nativity scene in which it dealt with unwanted exposure. Obviously, since then, the Supreme Court has consistently held that unwanted exposure to basically displays of religious endorsement on religious property do, in fact, give standing. And as to Mr. Cox's membership, I would note he joined the foundation ten days after the lawsuit was filed, which is true. This is not a situation where he went out and sought out the monument in order to, or the statue in order to object to it. He joined FFRF because, in fact, he'd objected to that statue in its own right for many years. And in terms of the issue of whether or not his joining the foundation ten days after the lawsuit was filed, the court said that there was no, the district court said there was no authority for considering his situation. But, in fact, there is precedent that was cited to the district court as well as to this court, including Delta Coal Program versus Lipman, which is cited in our reply brief to this court, and it was cited to the court, the district court, in which the court said that, for instance, you can actually, that dealt with a situation where there's actually a substitution of the first named plaintiff, but the substitution dealt with someone who was raising exactly the same issues, and functionally the substitution of one for the other did not have any effect on any of the issues that were raised. And that issue was also then reaffirmed in another more recent decision, Smith versus CHF Industries, which is from the Southern District of New York in 2011. And there the court said, in terms of that, in terms of whether the membership issue with that ten days made a difference, that it doesn't make sense where you've added someone, and the issues are all the same, to say that because you lost, for one reason or another, the original named plaintiff that you can't substitute and you've got to go and start over, that that's just putting, really form over substance. I'm sorry, Your Honor, say it again. Why did you get into the merits? Why did I get into the merits? Is that what you asked me? Yes, I will. The issue, the issue in terms of whether or not, the issue arises under the establishment clause, but it comes to this court on a summary judgment decision. The establishment clause, I believe, and I believe the correct application, the correct standard is the Lemon Standard, prohibits the endorsement of, the government endorsement of religious messages. And here, I think that the argument, the contrary argument is that Van Orden should apply. Van Orden deals with, essentially, the museum context where you have historical, essentially, museum, where you do not have government endorsement. So I think the Lemon Standard is applicable, and I think that in this particular case, what was particularly at fault with the district court's decision was that in terms of the question of whether or not there was intent or a perception of religious endorsement by this monument, essentially, the court did not treat this as it would normally treat other summary judgment matters. The court essentially, the issue of whether or not, for instance, on endorsement, the question of whether or not there was a record from which you could conclude that there was endorsement, I think, is a disputed factual record. And the district court has the government essentially cherry-pick facts and draw inferences against the non-moving party. So the question, then, is whether or not, you know, your honor speaks to the question of well, the title to the religious monument was never given to the government. But in terms of the question of religious endorsement, it is not essential that the government actually have title to it. The question is whether or not there's a perception of religious endorsement. That's right. And therefore, it seems to me that you have to explain to me why this isn't private speech on a public land. If it's private speech on a public land, it seems to me that it's protected under capital square. Under what capital square? If the government neutrally allows private speech in a government forum, it does not violate the establishment clause. The question? Here, I mean, I'm just saying you need to distinguish for me capital square. Because it seems to me this is dead on with capital square and the progeny that came thereafter. I think the distinction is between the question, you're dealing essentially with a monument here. And the Supreme Court itself has distinguished monuments from other forms of public forums. Obviously, we're not dealing with traditional public forum and in terms of a limited public forum. In terms of monuments, I do. And the capital square is about a Latin cross that stood alone on public property in front of Ohio's capital. Capital square did not deal with a permanent monument. And even the Supreme Court's most recent Walker decision in the Confederate flag case makes, recognized the significant difference between the issue of endorsement when you're dealing with monuments versus something that may be more ephemeral. I do not believe that in this case that the government designated the force and had a policy and practice of opening the force as a form for discourse. I'm, yes, I guess that's against all the facts that I saw in the record. If I read the facts, the records suggest the government let everybody have their dog, quote unquote, for Idaho onto this property. Your Honor, with respect to government speech. I read what it says here. And I guess I'm trying to figure out why this isn't the same. I think it's, I think, I do not believe. The Forest Service provided a list of all the monuments currently authorized by special use permits. Your Honor. The permits include a variety of secular and religious organizations. In circumstances where the government has created a limited public form in which they're encouraging and opening the form for discourse. There's basically not an issue of endorsement there because you're dealing with a public form. But with the issue of essentially permanent monuments, I think that the government, and this goes to the question of summary judgment. The question of endorsement with this type of monument. Does this monument give the appearance of government endorsement? In all of the Supreme Court's recent pronouncements indicate that with monuments there is a significant inference of government endorsement. And so in terms of the First Amendment, the free speech, the public form analysis, with respect to the establishment clause and the issue of endorsement, I think that the establishment clause, you've got two constitutional provisions here. In the issue, in the circumstance of a permanent monument that gives the appearance of religious endorsement, I think the establishment clause takes precedence over the free speech analysis. As the Supreme Court said in the Suman decision and actually repeated in the recent Walker decision. Now the question then ultimately is, is there religious endorsement? And I believe that that presented a disputed factual issue for the district court that should not have been decided as a matter of summary judgment. And that if in fact there is found to be endorsement due to this shrine, that in fact, in that circumstance, it does take precedence over the public form analysis. My time is up, Your Honor. Thank you. Are there issues of fact that remain to be determined? I'm sorry, say it again, Your Honor. Are there issues of fact that remain to be determined? Yes. I believe there are issues of fact. One of the issues of fact that I've described is whether or not there is in fact an appearance of religious endorsement here. I think the government's own evidence, their own historical commissioned analysis indicates that there's still, that there was originally, when it was originally put up, religious endorsement and that that has not changed. The other factual issue that I think is critically important is because the government argues that this renewal process was done pursuant to a neutrally applied policy and practice of the government. But the evidence, the evidence of record here is that after there was a government, after there was a public hue and cry when this renewal was initially denied in 2011, I believe, the government went back and basically, in my opinion, engaged in a sham analysis. But certainly there are disputed issues of fact as to whether or not even the process of renewal in 2011 was in fact a neutral policy or in fact the product of a process that gave favoritism to the religious endorsement. Now we have a number of other cases in the Ninth Circuit that involve religious symbols. The case that I think is probably most directly relevant to this issue, the issues in this case in the Ninth Circuit, Your Honor, is the, I can't tell you the full name, the Trump decision. And I think if, and that dealt with, the Trump, T-R-U-N-K, Trump decision which dealt with a cross that was, that the argument was that it was essentially a war memorial. And I think that the Ninth Circuit's analysis in that case is probably, it is highly instructive to this case, Your Honor. And the site was where, yeah? Say, pardon? The site. The site of the, you know what, I can give it to you, it's cited by both parties in our briefs. I don't have the Trump decision site in my mind, but it is readily in the, in all the briefs. And I, in fact, if you'd like me to quick grab it from my. We've got it here. Judge Pregerson, do you mean the site as in S-I-T-E, or do you mean the site as in C-I-T-E? Oh, I'm sorry. Maybe I misunderstood. You're asking me, in Trump, I believe the cross that was that issue was in San Diego. And in terms of where, I think that's kind of important. It was not in the context, it was not in the context, for instance, in the Van Orden situation where you had a historical museum. It was essentially a stand-alone statute. And the argument was that it was recognized and commissioned as a war memorial. And the court said, well, the fact that the identity of the requester is not determinative of whether or not what you've then commissioned and put up is, gives it the appearance of a religious endorsement. I would note that in the present case, the argument is that, well, if the government puts a, allows religious statutes of any sort out in the forest, that unlike, that that gives less endorsement than if the government allows a display in front of the courthouse. But in fact, in terms of the concern about religious endorsement, in terms of public land, the fact that you go out on a U.S. forest land and all of a sudden see a monument, and the Supreme Court has said monuments historically have given, been used by the government to convey messages. And in fact, people don't normally allow monuments on their land permanently, essentially, without concurrence with the message that's being conveyed. So the fact, it's almost the incongruous nature of this Jesus statue, which was selected nonetheless, as the court, as the court said, for almost religious purposes of its own, in terms of its unique contemplative and serenity. So I think the site of the statue in this case distinguishes it from Van Orden, makes it like Tronk, and certainly in this particular case, in the context that we're dealing with, I think actually enhances the appearance of endorsement. Thank you. That is all. May it please the court, my name is Joan Pepin, on behalf of the Forest Service. I'll be splitting my time with Mr. Baxter, who represents the owners of the statue of the Knights of Columbus. By any of the tests this court and the Supreme Court have set forth to govern establishment class challenges, this 60-year-old, six-foot statue of Jesus. I'm sorry, your honor. I'll try to slow down. By any of the tests this court applies, this privately owned, 60-year-old, six-foot statue of Jesus, located by the side of a ski slope on a commercial ski resort, is not an establishment of religion by the government. The limit test this court applies looks first to the government's purpose. This is a very deferential standard. All that is required is that the government action be motivated at least in part by a secular purpose. The government's reissuance of the permit in this case is supported by two purposes. One was to preserve a statue with local historical significance, and the other is simply the Forest Service doing its job. When somebody submits a permit request, it must grant or deny it, and that's the purpose, just implementing its regulations. Counsel, can you help me understand where the geography here, I mean, I know this is way up on the top of the mountain. You've got this private ski company. Do they own the land, or do they lease the land from the Forest Service? Some of each. The bottom reaches of the ski resort are on privately owned land, and the upper reaches are on Forest Service land that is leased. The statue is on some of the leased land. Okay, so when you get off the ski lift, you're on Forest Service land that's leased to the private company. Correct, Your Honor. Thank you. Now, regarding the purpose, the plaintiffs have said that it's a sham to say that this is a historical monument, but that is not true, and it's demonstrably not true. Their argument rests on their claim that a religious property cannot be on the historical register and at the Forest Service, and the Montana State Historical Preservation Officer allegedly cooked the books to find that this statue of Jesus was not religious. That's not the case. What they found was that it had local historical significance due to it being one of the last remaining vestiges of the early days, as the district court, of the early days of skiing at Big Mountain. And the district court found that to many, it serves as a historical reminder of those bygone days of sack lunches, ungroomed runs, rope toes, T-bars, leather ski boots, and 210-centimeter skis. It's just a beloved local quirky monument that has, it's one of the few remaining pieces of the early development, and it was preserved for that reason. So, we have a valid secular purpose. And. Is this a question of fact, which you're now arguing, or is this an undisputed fact in the record? The only evidence they've put forward that it's a sham is their argument that you can't put a historical property on the national, I mean you can't put a religious property. There are no facts that they have put in to make this disputed. Is that what you're saying? Whether the government's purpose. Yeah. I don't believe there are any other facts to support their argument that the government's purpose is a sham. The only argument that they've put forward in support of that is that we can't put a historic property. As this court held in Access Fund and in Choller Ready Mix, there are many religious properties on the National Historic Register, the National Cathedral, the 16th Street Baptist Church in Birmingham, Druro Synagogue, are all on the National Register for their historic significance. And this statue too, though it is of course religious, it's a statue of Jesus, has local historic significance and in our addendum to our brief, you can see on page 71, there's a criteria for including things on the National Register. And as the Montana State SHPO found, this one falls pretty squarely within those criteria. So, hopefully we clear the purpose hurdle and move on to the effect. Now, in a case like this one, where the speech is private speech on public land, when you test for endorsement, you don't look at the speech itself because that speech is somebody else's speech. What you look to instead is the government's action, which was issuing the permit. And in order to show an endorsement, the plaintiffs have to show that the government discriminated in favor of private religious expression or activity. That is a quote from Capitol Square. There is no evidence sufficient to support a reasonable inference in this case that there was any discrimination in favor of religious users in this case. As the court noted, there are many other monuments on public land and this one was not given any favoritism. The reissuance was done in pursuit of neutral regulations that allow reissuance when certain neutral criteria are met. That the use is consistent with the forest plan, that the use is the same as the previous permitted use, that the permittee is in compliance with the terms of their permit, and that they have the wherewithal to remain in compliance in the future. That's all. It seems to me that your opponent suggests there are disputed facts as to this issue. And I guess that's the worry. We have a summary judgment here. I've raised it one more time, once before, now I raise it again. Are there disputed facts that were decided on summary judgment or are these undisputed facts you now argue to me? Well, first of all, endorsement is a legal determination and it is based on the facts. But in order to show discrimination, they would not have to just say we disagree with these facts, but put forward evidence to prove that the government discriminated in favor of the Knights of Columbus or in favor of religious uses generally against secular uses. And they have three things they cite in support of that, none of which is sufficient to support a reasonable inference that a reasonable finder of fact could give judgment for them, which is the standard for disputed material fact. One of them is in the excerpts of record on page 228, in some internal correspondence, somebody in the Forest Service said we wouldn't grant one of these today. That is not evidence of discrimination because, as we explained, in 1998, the Forest Service changed its regulations so that monuments are much, much harder to get permits for these days. And so, saying we wouldn't grant one of these today is not evidence of discrimination on a religious basis. Very similar on page 226, there's some internal, or some notes at a meeting where somebody said that the Forest Service has rejected requests to put up monuments, grave markers, and crosses. There's no information in those notes about when these denials occurred. Given, there's two things about that. One is, given that since 1998, and these comments were made in 2011, since 1998, it has been the Forest Service's regulations and policies not to give permits to things like that, somebody saying we've turned them down is no evidence whatsoever of any violation of the rules or favoritism. Moreover, some of the monuments that they said they turned down are religious. Crosses are religious. And so, it does not show discrimination in favor of religious uses. The third thing they point to is simply the same argument we discussed in the purpose argument, where they say that we bent the facts to find that the Jesus statue was not religious and not commemorative, so that we could put it on the National Historic Register, which allegedly does not allow religious properties, but that's just not supported by either the law or the record. Everybody acknowledged that it's religious. It's just that it's private religious speech, and it also has historical significance, which is what justifies. So, those are the only evidence. It's their burden to prove discrimination in order to show endorsement. And the only arguments they put forward are not sufficient to support a reasonable inference that the Forest Service discriminated. On the contrary, they followed neutral regulations and treated the Knights of Columbus the same way that they would treat any other applicant for a permit extension. On the, if the court thinks Van Orden applies to this case, it's similar. You would look at the use of the statue. Now, the government basically hasn't used the statue at all. Private people do. The use has been mixed, but the uncontradicted evidence in the record is that it's been used primarily as a meeting place, as a photo backdrop, and as a quirky local landmark and reminder of how it used to be at Whitefish. And so, that's the use. Now, the context could not be much more secular. It's a ski slope. There's no government buildings. There's nothing around to suggest that this has the imprimatur of the government behind it. There's also no trappings for worship or revering the statue. It's usually wearing a ski helmet. There's nothing about this context that suggests that devotion is encouraged. And finally, there's the history. In Van Orden, the controlling opinion found that it was determinative, that that monument of the Ten Commandments had stood on the state capitol grounds for 35 years before anybody brought a challenge to it. In this case, it was 57 years between when this statue was erected in 1954 and when Freedom from Religion Foundation started filing FOIA requests and writing letters to the Forest Service and then another year until they filed their complaint. So, 35 years was determinative in Van Orden. I think the 70, sorry, 58 years in this case should be even more so. Would the court like me to address standing? No? No. I ask the only questions I have, and I expect you're going to give a different answer. That's why I ask about him. All right. Well, then I think I'll give the remaining time to Mr. Baxter. Thank you very much. Thank you, Counselor. Good morning, Your Honors. Eric Baxter on behalf of the Knights of Columbus. May it please the court. I'd like to address just some of the Establishment Clause issues, and then if the court is interested, I can address also standing. But I think it's helpful to give the court the full context of how the statue sits on the mountain. The only way to see the statue is to enter through a private resort, pay money to the private resort to ride their ski lifts, ride those ski lifts to the top of the mountain. And then you still only see the monument if you choose a particular run at the very edge of the resort, and only seeing where it stands, the monument stands shrouded by a, in a stand of trees, so that you only see it if you pass by, if you happen to look by to the left. Ian Cameron, one of the members of FFRF that had initially identified, you can see in the supplemental excerpts, at 75 testified that he had lived there for 10 years and skied frequently and never seen it. Dan Graves, also President and CEO of the resort, testified that he was there for three weeks skiing the mountain before he first noticed it was there. And there's no particular reason to stop there unless you want to look at the statue, in which case if you do, there is a sign there that says this was installed by the Knights of Columbus, and its purpose is to memorialize soldiers who died fighting in the Alps in Italy during World War II. And on top of all of that, this statue is literally in the middle of nowhere. There's nothing around it, no capital building, no courthouse, nothing that would suggest the trappings of government or government authority endorsing the, endorsing the monument in a way that would suggest that anybody is excluded from the political community because of their religion, which is the standard that has to be met. I want to draw the court's attention to the Christian Science Reading Room case at 784F2nd1010, which emphasizes that the commercial context is particularly important here to show that there is no risk of confusion. In that case, an airport, which was run by the city and county of San Francisco, had for 30-some years leased space to the Christian Scientist Church for a reading room and then decided that it was violating the establishment clause by doing so and tried to cancel the lease. And when the Christian Scientist Church sued, this court held that there was no endorsement. There could be no endorsement in a commercial context, even though there it was a commercial environment run by the city. There could be no endorsement because the commercial context signaled to the reasonable observer that this was not the government endorsement of religion anymore than it was endorsing the books sold in the bookstore in the airport or the, you know, the sourdough bread used at the local sandwich shop there. And this case is, of course, even much easier because we're not even talking about a government run commercial context, but a privately run commercial resort where you enter it only by paying a ticket, presumably with the assumption that what you see on the resort is going to be, belong to the resort and not the government. What the, what FFRF is proposing, in contrast, would itself violate the Constitution as discrimination on the basis of speech. And if you look at the initial decision, the Forest Service only denied the permit initially because it was responding to essentially a heckler's veto from FFRF, a letter threatening to sue if it didn't remove. At ER 84, you can see the Forest Service analysis where it didn't even address the public, the private speech on public forum aspect of this case. And the, and the Forest Service analysis admits that it was not complying with the legal requirements it had under the National Historic Preservation Act to determine the historic value of the monument. So that would have actually been the constitutional violation if the Forest Service had denied the permit targeting the Knights of Columbus because of their, because of their speech. And if you look at the range of cases that have dealt with this issue, you know, Kreisner and Panet are the most on point because they deal with private speech in a public forum. And in both of those cases, the monument was upheld in facts that are less favorable even than in here. In Kreisner, you didn't have the private commercial context that would distract the reasonable observer from thinking there was government influence. And in Kreisner, although there was a sign, the court didn't even consider it.  So how do you distinguish Sumum? Well, in Sumum, the court found that the monuments were government speech because the government had taken control and ownership of the monuments. And those individuals who had donated the monuments had relinquished all control. And so the court held that that was government speech and not subject to the restrictions of the free speech clause. In contrast here, you have private ownership of a monument on public, on a public forum. And it's also notable that in Sumum, the court said that although forum analysis typically did not apply to permanent monuments, there were some circumstances in which it would apply. And Panet, in this case, are obvious examples when you would apply the forum analysis because of private speech on public land. And other cases that this court can refer to for that. So in that way, and I guess that was going to be my next question, in some instance that your opponent suggests, well, you can say all you want, Judge, about Capitol Square. You can say all you want about those cases that follow Capitol Square. But this is a monument. Monuments are different. I would refer the court to a few cases in response to that and one other response. First, in Barnes-Wallace, a very similar situation where the court reviewed leases that the city of San Francisco was issuing to different organizations, including the Boy Scouts of America, which was considered a religious organization. There, there were only 100, I think 125 leases that were available. The city did not open them up for bidding. It selected groups that it thought would do a good job. And it negotiated the leases exclusively with those organizations for leases that were 25 or more years in length. And in that case, the court said that looking across the broad scheme of the program, there was no evidence, you know, the plaintiffs had introduced no evidence to suggest that there was favoritism shown in the way that those leases were negotiated. And the similar. Was there enough evidence in this record that I can determine without sending it back that there is no favoritism? Absolutely, Your Honor. It's, first of all, it's the plaintiff's burden to show if there were favoritism. The plaintiff has showed, has failed to show anything in that regard. Here we also have in the record the, the regulations and if you look at the Barnes-Wallace and Preissner cases, there were not even a written policy. And the court said that the plaintiff's, in Preissner in particular, the plaintiff's failure to introduce evidence that there had been non-discriminatory, or that there had been a discriminatory exercise of the program was sufficient to uphold it going forward. You can also look at the list of monuments that was introduced by the Forest Service to see that there is a wide range of monuments that are overwhelmingly secular with only a few that have any kind of religious significance. So if I look at Walker, that's about license plates. How do you distinguish this case from that? Walker was also a government speech case where the government held that license plates are essentially government IDs. And so because of that, they have the name of the state on the license plate. The government dictates how you display the tag, how you dispose of the tag. Those factors overwhelmed any other factors to show that this was government speech and not private speech. In that case, the court held that there had been no form created. In contrast here, contrary to Mr. Counsel for FFRF's statements, the case law is extensive in this circuit and in others that the forest, the National Forest Service system, the entire system, is a traditional public forum. And I would cite the court for that to U.S. versus Griffin at 200 F3rd Joel 56 and also to U.S. versus Linnick at 195 F3rd 538. And there's really no dispute here that there's extensive activity going on in the Forest Service, including under the new regulations, and that it is a forum that the knight's speech is private speech and that to target the knights themselves because of the religious nature of that speech would be discrimination and violation of the Constitution. And there is no factual dispute that would prevent the court from reaching that conclusion. In Lynch, the Supreme Court held that the question of what the reasonable observer knows is a legal question. But if you take the facts, the social facts as presented in the record, and the court can make the determination from there whether there is a violation of the establishment clause. I would just also like to, in closing, distinguish the cases that FFRF is relying on, in particular the trunk case where the government owned the monument. You had a 43-foot tall Latin cross that stood at the very top of a hill, towering over the freeway. There was a long history of religious use, including annual Easter services, where the significance of the cross as a Christian emblem was emphasized. The court there said there was a thin record of secular use that would counter the religious history. And there was also an extensive history of anti-Semitism in the community that reinforced the perception of the cross as excluding others from the political community. So seeing that trunk, its facts, is one of the most extreme cases. Every other case almost looked at by this court, or the Supreme Court, be it Card, Van Orden, where there was government involvement, monuments were upheld. In the cases that are closer to this one, where there was private speech on a public forum, the Kreisner, Panet, Barnes-Wallace, Christian Science Reading Room, also all of those things, all the religious role was involved. In closing, Your Honor, I see my time has expired. This monument was installed by the Knights of Columbus to memorialize veterans from the 10th Mountain Division. It's their private speech. And to target that speech because of its religious significance would be unconstitutional discrimination against the Knights of Columbus. Why don't you come to the microphone, counsel? He says he didn't have any time left. Oh, well. We give time. Pardon? Go ahead. All right. Thank you. I will, I'll, I'll, I'll, I'll just give you a couple of points. A couple of points. Number one, in terms of the government's attempt to shoot on the endorsement issue as simply that, that, that there must be evidence of discrimination. I do not believe that the government's understand. Pardon me? All right. He can't hear you because you're not using the microphone. Yeah, I'm sorry. Your Honor, you and I are about on the same page here in terms, I don't hear very well. Either, as you well know, as everybody in the courtroom knows. Knows what? Knows what? All right. You know, let me, my buddies say a discussion with you, Rich, is really interesting because you respond to things that no one ever said. The question of endorsement is not simply one of evidence of discrimination. And the question is whether or not it gives the appearance that the government is endorsing. And so I disagree with the government's attempt to shoot on this into the question as simply one of discrimination. But in terms of whether or not there was an application of an even neutral process of renewal here. I do believe, though, that if you look at the evidence in the context of the discussions that went on within the Forest Service, that the renewal process here, the reconsideration itself, I believe there is evidence from which the court can draw the inference that there was not a neutral application of their policies. Including the question, I mean, they ended up from, they ended up in the first decision concluding that in a meeting with the Knights of Columbus that this monument would not satisfy historical register criteria. And then ended up with the conclusion after reconsideration, and this is what they had to conclude, that it was not associated, that it was no longer associated with a historical person or event. And that's what, that was the criteria. And even Mr. Baxter indicates in his argument that the monument was placed for the purpose of honoring the soldiers. And so in terms of, and the shrines that they saw in Europe. So even the Knights of Columbus do not concur that this statue is no longer associated with any historical person or event. And then the last point I'll make real quick is simply that in regard to Barnes-Wallace police case, Barnes-Wallace is not an exposure case. It's not a display case. There was no question there that some display gave the appearance of religious endorsement. And so I do not believe that Barnes-Wallace really has any application to the present case, which is a display case. And in terms of whether or not, you know, the government's attempt to characterize the lease, the statue, as well as the Knights of Columbus as something that you hardly even know is there. Well, the inference that this has historical significance to the area and that people come to see it is belied by the evidence as to why they think that it should be preserved. And finally, it is simply not the case that in an exposure case that individuals have an obligation to avoid government exposures. The issue is not one of coercion with exposure. The question is, is the government giving the impression of endorsement? And with respect to the Knights of Columbus statue in this case, it was approved by the government as a religious shrine, as requested by the Knights of Columbus. And inherently, you cannot say then that the intent or the issue of endorsement are somehow other than what was announced when it was put up. I believe that there are disputed issues of factor as to the application, the neutrality, the underlying factual questions of how is it perceived. And if this was any other type of case, if this was not a religion case, if this was other litigation, I have no doubt that this case would not have been decided on summary judgment. The issue, the critical issues on which the law must be applied are disputed in this case. Thank you. Thank you very much. Thank you for your arguments. Excellent. That's all the arguments today. And we'll recess until 9 a.m. tomorrow morning.
judges: Pregerson, Smith, Owens